AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

The premises located at 2813 Independence Ave, apartment A, South Gate, California 90280

)
)
)
)
)
)
)
)

Case No. 2:21-MJ-4069

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm), 922(a)(1)(A) (dealing in firearms without a license), 371 (conspiracy), and 2 (aiding and abetting)

The application is based on these facts: *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Marlene Lopez
_____
*Applicant's signature*

*Marlene Lopez, ATF Task Force Officer*
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA_____

Hon. Paul Abrams, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Sara Milstein (x8611)____

## ATTACHMENT A-2

PREMISES TO BE SEARCHED

The premises to be searched is located at 2813 Independence Avenue, Apartment A, in South Gate, California 90280 ("SUBJECT APARTMENT A").  The premises containing SUBJECT APARTMENT A, as depicted in the photographs below, is a gated multifamily structure.  The premises contains two two-story buildings: a duplex in the front containing apartments A and B, and an additional unit C in the back, located above carports.

The premises containing SUBJECT APARTMENT A is further described as a family compound with light colored walls. SUBJECT APARTMENT A is the bottom unit the front duplex.  The numbers and letter "2813A" are affixed on the front of the building above the bottom unit's front security door.  SUBJECT APARTMENT A has a black security door which face south towards Independence Avenue and opens from right to left.  A tan colored metal fence encloses the driveway and front yard of the premises containing SUBJECT APARTMENT A.

SUBJECT APARTMENT A includes any attached or detached garage or storage areas located on the parcel containing SUBJECT APARTMENT A, as well as any vehicles in any garages, driveways, or curtilage areas on the parcel.

(*photographs continued on following page*)





**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm), 922(a)(1)(A) (dealing in firearms without a license), 371 (conspiracy), and 2 (aiding and abetting) (the "Subject Offenses"), namely:

a.   Firearms or ammunition;

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

d.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, CashApp, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

e.   Records, documents, programs, applications, materials, or conversations relating to the sale or purchase of guns or ammunition, including correspondence, receipts, records, and documents noting prices or times when guns or ammunition were bought, sold, or otherwise distributed;

f.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of guns or ammunition;

g.   Contents of any calendar or date book;

h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

a.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

b.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**

4.    In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

7.  During the execution of this search warrant, law enforcement is permitted to: (1) depress MANGANDI's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MANGANDI's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Marlene Lopez, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of an application for a warrant to search the following individual, three residences, and four vehicles:

        a.    The person of ALEXANDER GABRIEL MANGANDI ("MANGANDI"), as described more fully in Attachment A-1;

        b.    The following three apartments all located on the same parcel, 2813 Independence Ave, South Gate, California 90280, all utilized by MANGANDI:[1]

                i.    The premises located at 2813 Independence Ave, apartment A, South Gate, California 90280 (the "SUBJECT APARTMENT A"), as described more fully in Attachment A-2;

                ii.   The premises located at 2813 Independence Ave, apartment B, South Gate, California 90280 (the "SUBJECT APARTMENT B"), as described more fully in Attachment A-3;

                iii. The premises located at 2813 Independence Ave, apartment C, South Gate, California 90280 (the "SUBJECT APARTMENT C"), as described more fully in Attachment A-4;

        c.    The following four vehicles, utilized by MANGANDI:

_____

        [1] As described further below, the SUBJECT APARTMENTS A, B, and C are all located on the same parcel of land.  Based on the observations of law enforcement, described below, all three apartments are all used by MANGANDI, his girlfriend, and his girlfriend's family.

        i.    A black 2011 Audi bearing California license plate 8FRC423, registered to Kimberly Merced Villa at SUBJECT APARTMENT B ("SUBJECT VEHICLE 1"), as described more fully in Attachment A-5;

        ii.   A silver 2010 Lexus bearing California license plate 7ZWA396, registered to Diane Villa at SUBJECT APARTMENT C ("SUBJECT VEHICLE 2"), as described more fully in Attachment A-6;

        iii. A gray 2017 Cadillac Escalade bearing California license plate 8HIY429, registered to Nicolasa Villa at SUBJECT APARTMENT C ("SUBJECT VEHICLE 3"), as described more fully in Attachment A-7; and

        iv.   A white 2016 BMW model 528i bearing California license plate 8WCY402, registered to Joseph Haberlack at 14866 Larkspur St, Sylmar, California 91342 ("SUBJECT VEHICLE 4") as described more fully in Attachment A-8.

    2.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm), 922(a)(1)(A) (dealing in firearms without a license), 371 (conspiracy), and 2 (aiding and abetting) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, and B are incorporated herein by reference.

    3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am a Task Force Officer with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  In that role, I participate in investigations involving prohibited persons possessing firearms, firearms trafficking, the possession of illegal firearms, and sales of controlled substances.  During my time as a Task Force Officer, I have participated in multiple ATF operations with federal special agents ("SAs") and local police.

5.    Additionally, I am a police officer with the Los Angeles Police Department ("LAPD") and have served in that role since November 2007.  I was assigned to the 77th Street Area as a patrol officer where I participated in dozens of investigations regarding violent crime, illegal drugs, and illegal possession of firearms.  As a patrol officer, I interviewed criminal suspects, as well as victims and witnesses of crimes.  I have also participated in investigations focusing on gang activity.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    MANGANDI, who lists SUBJECT APARTMENT B as his residence and uses SUBJECT APARTMENTS A, B, and C as his own, used SUBJECT VEHICLES 1-3 to travel to meet ATF undercover

agents, where he sold them firearms, ammunition, and firearm parts to the undercover agents.  SUBJECT VEHICLES 1-3 are registered to SUBJECT APARTMENTS B and C.  MANGANDI also contacted an ATF undercover agent and inquired about installing a hidden compartment in SUBJECT VEHICLE 4.  Additionally, during agents' surveillance operations, agents saw MANGANDI engage in what appeared to be two firearms sale transaction in front of the building containing SUBJECT APARTMENTS A, B, and C.

7.    MANGANDI has previously been convicted of a felony and is therefore prohibited from knowingly possessing firearms and ammunition.  Moreover, MANGANDI does not possess a federal firearms license and is therefore not authorized to sell firearms.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    MANGANDI Sold Numerous Firearms and Firearm Parts to Undercover Law Enforcement Officers**

9.    Between April and June 2021, MANGANDI sold numerous firearms and firearm parts to people MANGANDI thought were gun purchasers, but who were, in fact, undercover ATF agents.  From my review of the undercover agents' text messages and recorded phone calls with MANGANDI, I know that before each of the transactions, MANGANDI communicated with the undercover ATF agents by telephone and text message to arrange for the transactions and to negotiate a price.  Based on my review of

records from the cell phone carrier of MANGANDI's phone, I know
that the subscriber is Diane Villa at SUBJECT APARTMENT C.  As
noted above, Diane Villa is also the registered owner of SUBJECT
VEHICLE 2.

10.  From my presence at some of the transactions, my
conversations with other law enforcement officers, and my review
of reports and recordings from the transactions, I am aware of
the following:

a.  On or about April 7, 2021, MANGANDI sold an AR-
type rifle to an ATF undercover agent in exchange for $1,200.
MANGANDI drove SUBJECT VEHICLE 1 to this controlled purchase and
retrieved the firearms and firearms parts from inside of SUBJECT
VEHICLE 1 before selling them to the undercover ATF agent.

11.  On or about May 14, 2021, I was present on
surveillance when MANGANDI sold a box of lower receivers and a
box of upper receivers to an ATF undercover agent in exchange
for $6,900, assuring the undercover that the firearms were fully
operable.  MANGANDI drove SUBJECT VEHICLE 1 prior to meeting
with the undercover.  Based on my training and experience and my
knowledge of countersurveillance driving techniques, it appeared
to me that MANGANDI was conducting countersurveillance with
SUBJECT VEHICLE 1 based on MANGANDI's evasive driving maneuvers.
MANGANDI returned to the premises containing SUBJECT APARTMENTS
A, B, and C and changed vehicles from SUBJECT VEHICLE 1 to
SUBJECT VEHICLE 2.  MANGANDI drove SUBJECT VEHICLE 2 to this
controlled purchase.  MANGANDI retrieved boxes containing the

upper and lower receivers from inside the trunk of SUBJECT
VEHICLE 2.

　　　　a.　On or about May 26, 2021, MANGANDI sold to
another undercover ATF agent two fully automatic handguns with
Glock switches (which convert the gun from semi-automatic to a
fully automatic machinegun), a .45 caliber handgun, three
backplates (firearm accessories), and a firearm magazine, in
exchange for $3,000.

　　　　b.　On or about June 9, 2021, when MANGANDI sold to
an undercover ATF agent what he represented were three privately
manufactured handguns with Glock switches (which are used to
convert the gun from semi-automatic to a fully automatic
machinegun)[2], a 7.62 rifle, a 9mm handgun with an obliterated
serial number, a .45 caliber handgun, and a Glock 9mm handgun,
in exchange for $9,900 in cash.  MANGANDI also provided the UC
with a variety of assorted ammunition and approximately 10 grams
of suspected black tar heroin.

　　　　c.　On or about June 21, 2021, MANGANDI sold four
Glock pistols, two privately manufactured firearms (otherwise
known as "ghost guns"), one Springfield Armory XD firearm, two
revolvers, one AR-15 type rifle with a drop-in sear (a "drop-in
auto sear" is a combination of parts designed and intended to

---

　　　[2] Upon further analysis, the MANGANDI sold to an undercover
ATF agent what he represented were three privately manufactured
handguns with Glock switches were each missing a part, and
therefore are not considered finished firearms.  However, also
at the June 9, 2021 transaction, MANGANDI gave to the undercover
ATF agent a number of miscellaneous firearm parts, and among
them were the missing parts from the three privately
manufactured handguns with Glock switches.

convert the rifle to shoot automatically), and two high-capacity magazines to an undercover ATF agent in exchange for $12,500. MANGANDI also provided the undercover agent with a variety of ammunition.  MANGANDI drove SUBJECT VEHICLE 3 to this controlled purchase and retrieved the firearms and firearms parts from inside of SUBJECT VEHICLE 3 before selling them to the undercover agent.

### B.   MANGANDI Has Previously Been Convicted of a Felony

12.  On August 12, 2021, I reviewed certified conviction documents for MANGANDI and learned that MANGANDI has previously been convicted of the following felony crime punishable by a term of imprisonment exceeding one year:

a.   On or about June 26, 2013, a violation of Penal Code 211: Robbery, in the Superior Court for the State of California, County of Los Angeles, Case Number VA126346.

### C.   Interstate Nexus

13.  On or about August 11, 2021, an ATF interstate nexus expert examined all of the firearms bearing serial numbers that were purchased from MANGANDI.  The expert determined that each item was manufactured outside of the State of California. Because they were found in California, the items must have traveled in and affected interstate or foreign commerce.

### D.   MANGANDI Does Not Have a Federal Firearms License

14.  SA Nicole Lozano requested that MANGANDI's name and information be run in the Federal Licensing System, the ATF database listing people who possess federal firearms licenses.

As of April 6, 2021, MANGANDI did not possess a federal firearms license.

**E.   Investigation of the SUBJECT APARTMENTS A, B, and C, and SUBJECT VEHICLES 1-4**

1.   SUBJECT APARTMENT A

15.  On or about August 20, 2021, at approximately 1:32 p.m., SA Timothy Holden and I observed MANGANDI exit from SUBJECT APARTMENT B.  MANGANDI held a large white plastic bag containing unknown items as he walked down the stairs.  MANGANDI stopped in front of SUBJECT APARTMENT A and placed the white bag on the ground.  MANGANDI used keys to unlock SUBJECT APARTMENT A.  MANGANDI entered SUBJECT APARTMENT A with the white plastic bag.  At approximately 1:39 p.m., MANGANDI exited SUBJECT APARTMENT A empty handed.

16.  On or about May 18, 2021, I reviewed records from Accurint, a research service provided by LexisNexis, and learned that SUBJECT APARTMENTS A, B, and C are listed as on the same property parcel number, and all three are owned by the Mojarro family trust.  During surveillance, I saw a vehicle (not SUBJECT VEHICLES 1-4) parked in the driveway of the premises containing SUBJECT APARTMENTS A, B, and C.  I then used DMV resources to see the vehicle registrant's information.  The registered lessor of the vehicle was person with the last name "Mojarro" who also had an alternative last name of "Villa," at SUBJECT APARTMENT A.  During one of the undercover purchases with the undercover ATF agent, MANGANDI said that he lived with his girlfriend, and his

girlfriend's family lived in the other two apartments on premises containing SUBJECT APARTMENTS A, B, and C.

       2.   SUBJECT APARTMENT B

17.  Based on a search of records from the California Department of Motor Vehicles ("DMV"), I learned that MANGANDI reported SUBJECT APARTMENT B as his residence.

18.  On or about August 11, 2021, at approximately 12:31 p.m., I observed MANGANDI arrive at the premises containing SUBJECT APARTMENTS A, B, and C.  MANGANDI entered SUBJECT APARTMENT B.  At approximately 1:24 p.m. on the same day, I observed MANGANDI retrieve mail from the mailboxes at the premises containing SUBJECT APARTMENTS A, B, and C before returning to SUBJECT APARTMENT B.

19.  On or about July 30, 2021, ATF SAs Holden and Lozano conducted surveillance on MANGANDI at the premises containing SUBJECT APARTMENTS A, B, and C.  While there, they saw what they believed to be a firearms transaction take place between MANGANDI and another male, herein referred to as "Suspect 1":

      a.   On July 30, 2021, Suspect 1 arrived by car at the premises containing SUBJECT APARTMENTS A, B, and C.  MANGANDI exited SUBJECT APARTMENT B and walked to the passenger side of Suspect 1's car.  After a brief conversation, MANGANDI reached into the passenger side of the car and removed a black box.  SA Holden believed the box looked like a gun box with the brand "Glock" written across it.  MANGANDI walked back into his residence with the Glock box.  Approximately five minutes later, MANGANDI exited the SUBJECT APARTMENT B without the Glock box.

MANGANDI proceeded to walk to the back of the premises
containing SUBJECT APARTMENTS A, B, and C.  Suspect 1 exited the
driver's side of his car.  Suspect 1 walked to the back of the
premises containing SUBJECT APARTMENTS A, B, and C and out of
view.  SA Holden observed MANGANDI walk into SUBJECT APARTMENT A
through the front door.  Suspect 1 walked back towards Suspect
1's car.  Suspect 1 appeared to have a clear bag with an unknown
white substance inside.  Suspect 1 placed the bag in Suspect 1's
car.  MANGANDI exited SUBJECT APARTMENT A and both MANGANDI and
Suspect 1 walked back towards the back of the property and out
of view.  Approximately five minutes later, SA Holden observed
Suspect 1 and MANGANDI walk back into view.  MANGANDI appeared
to be counting cash before handing it to Suspect 1.  Suspect 1
placed the money in his wallet.  After a brief conversation,
Suspect 1 drove away and MANGANDI returned to the SUBJECT
APARTMENT B.

        20.  At the May 18, 2021 recorded transaction, MANGANDI
told the undercover ATF agent that he resided with his
girlfriend.  MANGANDI's DMV records show that he resides at
SUBJECT APARTMENT B.  SUBJECT VEHICLE 1 is registered to a
"Kimberly Merced Villa" at SUBJECT APARTMENT B.  Although the
DMV records for Kimberly Merced Villa provide that she resides
at 2813 Independence Ave, South Gate, California 90280 (which is
the premises containing SUBJECT APARTMENTS A, B, and C), the
records do not specify an apartment number.  I have reviewed
Kimberly Merced Villa's driver's license photograph and compared
it to a person I saw on surveillance at premises containing

SUBJECT APARTMENTS A, B, and C.  Indeed, based on my review of
Kimberly Merced Villa's driver's license, I saw her and MANGANDI
leaving and going into SUBJECT APARTMENT B on multiple
occasions.

        3.   <u>SUBJECT APARTMENT C</u>

21.  As noted above, the subscriber address for the cell
phone MANGANDI used to communicate with the undercover ATF
agents for all of the firearm sales was SUBJECT APARTMENT C.

22.  SUBJECT VEHICLE 2, used to travel to and complete the
May 14, 2021 transaction with the undercover ATF agent, is
registered to SUBJECT APARTMENT C.

23.  SUBJECT VEHICLE 3, used to travel to and complete the
June 21, 2021 transaction with the undercover ATF agent, is
registered to SUBJECT APARTMENT C.

24.  Based on all of these reasons, I believe that
MANGANDI, and his girlfriend, maintain control over and have
access to SUBJECT APARTMENT 3 and that such residence is likely
to contain evidence, including records, tying MANGANDI to the
Subject Offenses.  Indeed, this is also consistent with what
MANGANDI told the undercover officer, namely, that his
girlfriend and her family live in SUBJECT APARTMENTS A, B, and
C.

25.  I believe have not seen MANGANDI enter or exit from
SUBJECT APARTMENT C because SUBJECT APARTMENT C is at the end of
the driveway, tucked behind the building containing SUBJECT
APARTMENTS A and B.  Additionally, the front door to SUBJECT
APARTMENT C faces away from the street and therefore away from

my vantage point on surveillance.  Also, I have seen MANGANDI
walk from the back of the premises containing SUBJECT APARTMENTS
A, B, and C, where SUBJECT APARTMENT C is located.

      4.   SUBJECT VEHICLE 1

26.  On April 7, 2021, MANGANDI drove SUBJECT VEHICLE 1 to
meet with the undercover ATF agent, to whom MANGANDI sold an AR-
type rifle.  MANGANDI retrieved the firearms and firearms parts
from inside of SUBJECT VEHICLE 1 before selling them to the
undercover ATF agent.

27.  On May 14, 2021, MANGANDI drove SUBJECT VEHICLE 1
prior to meeting with the undercover ATF agent to whom MANGANDI
eventually sold firearm parts.  Prior to meeting with the
undercover, MANGANDI conducted countersurveillance in SUBJECT
VEHICLE 1 before exchanging that vehicle for SUBJECT VEHICLE 2.

28.  Based on a search of records from the California
Department of Motor Vehicles, I learned that SUBJECT VEHICLE 1
is registered to SUBJECT APARTMENT B.

      5.   SUBJECT VEHICLE 2

29.  On May 14, 2021, after conducting countersurveillance
in SUBJECT VEHICLE 1 as described above, MANGANDI drove SUBJECT
VEHICLE 2 to meet with the undercover ATF agent, to whom
MANGANDI sold firearm parts, namely, a box of lower receivers
and a box of upper receivers.

30.  Based on a search of records from the California
Department of Motor Vehicles, I learned that SUBJECT VEHICLE 2
is registered to SUBJECT APARTMENT C.

31.  As noted above, MANGANDI's cell phone is subscribed to Diane Villa, the same person to whom SUBJECT VEHICLE 2 is registered to at SUBJECT APARTMENT C.

### 6.   SUBJECT VEHICLE 3

32.  On June 21, 2021, MANGANDI drove SUBJECT VEHICLE 3 to meet with the undercover ATF agent, to whom MANGANDI sold ghost gun, revolvers, a fully automatic privately manufactured firearm, high-capacity magazines, and other firearms.  MANGANDI retrieved the firearms from inside of SUBJECT VEHICLE 3 before selling them to the undercover agent.

### 7.   SUBJECT VEHICLE 4

33.  On or about August 26, 2021, SA Holden and I were monitoring the premises containing SUBJECT APARTMENTS A, B, and C.  At approximately 2:30 p.m., we observed SUBJECT VEHICLE 4 arrive at the premises containing SUBJECT APARTMENTS A, B, and C.  From my vantage point, I could not see the driver inside of SUBJECT VEHICLE 4.  However, I saw MANGANDI walking from the direction of SUBJECT VEHICLE 4, and I did not see any other person near SUBJECT VEHICLE 4.  I therefore believe that MANGANDI was driving SUBJECT VEHICLE 4.  I then saw MANGANDI walk toward the premises containing SUBJECT APARTMENTS A, B, and C.  Then, at approximately 2:36 p.m., MANGANDI met with a male who arrived on a white BMW motorcycle.  MANGANDI and the male walked towards SUBJECT VEHICLE 4.  MANGANDI handed the male a blue bag.  Both men walked to the trunk of SUBJECT VEHICLE 4.  The male inspected the contents of the blue bag, MANGANDI reached in the bag and pulled out what appeared to be a black

Glock gun box.  The Glock box was placed on the trunk of SUBJECT VEHICLE 4.  The male placed the Glock box back into the blue bag and then retrieved a white box that resembled a P80 box kit based on its markings.[3]  MANGANDI then walked towards premises containing SUBJECT APARTMENTS A, B, and C as the male walked towards the motorcycle he arrived in with the blue bag in hand. The male further inspected the blue bag and retrieved from inside of it a black gun case showing the Glock gun logo.

34.  On or about August 5, 2021, MANGANDI contacted an ATF undercover agent via cellphone.  During the conversation, MANGANDI asked about getting a hidden compartment installed in a 5 series BMW, the same make and model as SUBJECT VEHICLE 4. MANGANDI informed the ATF undercover agent that he wanted the hidden compartment to be able to fit an "AR."  Based on my training and experience, I'm aware of the term "AR" is a reference to an Armalite AR-15 rifle-type firearm.

35.  On or about July 30, 2021, ATF agents observed SUBJECT VEHICLE 4 at the premises containing SUBJECT APARTMENTS A, B, and C.

36.  Based on my observation of MANGANDI's movements, his use of SUBJECT VEHICLES 1-3 in gun transactions, his desire to install a hidden compartment in SUBJECT VEHICLE 4 and my belief that MANGANDI transported firearms for sale in SUBJECT VEHICLE 4, and his use of SUBJECT APARTMENTS A, B, and C, I believe

---

[3] "P80," also known as Polymer 80, is a manufacturer that sells 80% firearm kits.  These kits typically include pistol frames and 80% receivers that can be used to manufacture fully functioning firearms.

there is probable cause to believe that MANGANDI keeps fruits,
evidence, and instrumentalities of the Subject Offenses in those
places.  Because MANGANDI used SUBJECT VEHICLES 1-4 and SUBJECT
APARTMENTS A, B, and C as his own, I believe that he keeps
belongings inside of each place.  I know that people who use
vehicles and residences as their own usually keep their
belongings and effects inside of those places.  Also, based on
my training, experience and knowledge of how gun traffickers
conduct business, I know that gun traffickers often hide
contraband and items relating to illegal gun sales in multiple
locations in order to avoid law enforcement detection.  I also
believe that gun traffickers use multiple residences and
vehicles in order to thwart law enforcement efforts to detect
patterns in their behavior.

### V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

37.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.   Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such in their digital devices.  It has been my
experience that prohibited individuals who own firearms
illegally will keep the contact information of the individual
who is supplying firearms to prohibited individuals or other

individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

      b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

      c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

      d.  Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[4]

38.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

40.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MANGANDI's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MANGANDI's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

41.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

20

## VII. <u>CONCLUSION</u>

42.  For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT APARTMENTS A, B, and C, of MANGANDI's person, and SUBJECT VEHICLES 1, 2, 3, and 4, and as described in Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, and A-8.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2021.


_____
THE HON. PAUL ABRAMS
UNITED STATES MAGISTRATE JUDGE